Filed 11/14/23  P. v. Chavez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049752 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1894659) |
| v. | |
| RAUL SOLORIO CHAVEZ, | |
| Defendant and Appellant. | |

A jury convicted defendant Raul Solorio Chavez of 10 sex crimes against a minor. The trial court sentenced Chavez to 130 years to life in prison, including five consecutive, determinate upper terms of 11 years.

On appeal, Chavez contends the prosecutor elicited and relied on inadmissible evidence from an expert witness about child sexual abuse accommodation syndrome (CSAAS), the trial court erred by instructing the jury with CALCRIM No. 1193, and the alleged errors were cumulatively prejudicial to his convictions.  In addition, Chavez contends that his sentence should be vacated and the matter remanded for resentencing based on postsentencing amendments to Penal Code section 1170, subdivision (b).[1]

---

[1] Unspecified statutory references are to the Penal Code.

For the reasons explained below, we affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In June 2021, the Santa Clara County District Attorney filed an amended information charging Chavez with 10 sex crimes committed against G. Doe (Doe): Aggravated sexual assault on a child under age 14 by rape (§§ 269, subd. (a)(1), 261; counts 1–4), aggravated sexual assault on a child under age 14 by oral copulation (§§ 269, subd. (a)(4), 287, former § 288a; count 5), and rape by force or fear of a minor 14 years of age or older (§§ 261, subd. (a)(2), 264, subd. (c)(2); counts 6–10). Counts 1 through 5 allegedly occurred between June 22, 2011, and June 21, 2014; counts 6 through 10 allegedly occurred between June 22, 2014, and June 21, 2018.

In June 2021, the jury found Chavez guilty on all counts.

In November 2021, the trial court sentenced Chavez to an aggregate term of 130 years to life in prison, comprising five, consecutive indeterminate terms of 15 years to life for counts 1 through 5, plus five, consecutive, determinate upper terms of 11 years for counts 6 through 10.

Chavez timely filed a notice of appeal.

B. *Evidence Presented at Trial*

### 1. Prosecution Evidence

The prosecution presented evidence that Chavez sexually abused Doe from age 12 through 17. Chavez was a romantic partner of Doe's mother (E.D.) and 20 years older than Doe.[2] Doe was almost 21 years old when she testified at Chavez's trial.

Doe explained that in 2011, when she was 11 years old, she lived with her mother E.D. and younger brother (B.D.) at the home of her godparents in San Jose. E.D. cared for Doe's godparents' children and could not afford a place of her own. Around this

_____

[2] We refer to Doe's relatives by their initials to protect Doe's privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4), (11).)

time, E.D. met Chavez. E.D. began a romantic relationship with Chavez, and he visited Doe's home. There, Chavez frequently grabbed Doe's buttocks and smacked them over her clothing. Doe felt very uncomfortable and told Chavez to stop, but he did not. Doe did not tell anyone what Chavez was doing to her because she was scared "of what he could do" and "didn't want to hurt" her mother.

In early 2012, when E.D. was about five months pregnant with Chavez's child, Doe and her family moved into a home with Chavez. They could not afford the home without Chavez's financial help. Chavez continued touching Doe's buttocks. He also became "aggressive" toward Doe and hit her. In addition, he was "very jealous" and "wouldn't let [Doe] have any guy friends."

One night in July 2012, when Doe was 12 years old, she was at home with Chavez and her younger brother while E.D. was in the hospital, having just given birth to a son fathered by Chavez. Chavez insisted that Doe watch a TV show with him from a bed in his and E.D.'s bedroom. Chavez began touching Doe's vagina over her clothing. He took off Doe's pants and put his penis into her vagina. Doe felt disgusted and horrible. She could not stop the rape because Chavez was "very aggressive," "manipulating," and stronger than her. Doe cried, asked Chavez why he was doing this to her, and told him that it was not right. Afterward, Doe experienced pain ("kind of like a burning sensation") when urinating.

Chavez told Doe not to tell her mother or anyone else about the incident. Chavez "would always tell [Doe] that if [her] mom was hurt, it was going to be [Doe's] fault." He also often said that Doe's siblings would be left without a father. Doe did not tell anyone what Chavez had done to her because she feared what would happen and was embarrassed.

Between July 2012 and April 2015, Chavez penetrated Doe's vagina with his penis more than 10 times and put his penis in her mouth once or twice. Doe often told Chavez that "it hurt" when he penetrated her and told him to leave her alone, but he did

3

not stop.  At times Doe tried to push Chavez off her, but he did not move.  He also grabbed Doe by her arms a few times while sexually abusing her.

During one occasion of sexual intercourse, Chavez unintentionally dialed E.D.'s phone with his phone.  While the call was connected, Doe told Chavez that the intercourse was hurting her.  Upon realizing that his phone had connected to E.D.'s phone, Chavez quickly disconnected the call.  He told Doe to call her mother back and tell her that he had hurt her by rubbing her hand.  Doe did so, and her mother believed her.  Doe was scared and did not want her mother to know what was happening.

When Doe was 13 years old, she told a boyfriend about the abuse but asked him not to tell anyone.  Around this same age, Doe began to harm herself, and Chavez encouraged the behavior.  On one occasion in 2014, after Chavez refused to let Doe skateboard with a friend and screamed at her to get in his car, he urged her to drink bleach after she cut herself.  E.D. called the police, who took Doe to a hospital in handcuffs.  After being seen by a doctor later that night, Doe was allowed to return home.

At some point around age 14, Doe talked to her mother by phone about Chavez's sexual abuse.  Chavez noticed the conversation happening and made Doe hang up the phone.  He then told Doe to call her mother back and say she had lied because she was upset with him.  Doe did so because Chavez was crying and said that Doe would destroy him and affect her mother.  Chavez often talked to Doe about how her actions would separate their family.  Doe felt that her family's happiness depended on her keeping the abuse secret.

In April 2015, Doe and her family moved into an apartment.  By this point, E.D. had given birth to another child (a daughter) fathered by Chavez.  Doe considered Chavez to be a father figure.  He made and enforced the rules for the family, emphasizing that he was the one who paid the rent.  E.D. deferred to Chavez.

Chavez refused to let Doe do things unless, in exchange, she gave him "días" or "days," which Doe testified meant sex.  Chavez would tell Doe how many occasions of

4

sex he wanted and, eventually, he "basically set up a schedule" for his desired sex. During the time that Doe lived at the apartment with Chavez and her family, Chavez had sex with her between one and three times per week. He also entered her room every morning, hugged her as she lay in bed, and kissed her on the lips.

Doe's younger brother B.D. testified that he saw Chavez get on top of Doe in her bed about 10 times. B.D. explained that Chavez hit him to stop him from telling E.D. about Chavez's actions. B.D. also testified that Chavez hit him as punishment, and B.D. saw Chavez hit Doe about five times. B.D. was afraid of Chavez and grew to hate him because of the way he treated B.D., Doe, and their mother.

When Doe was 17 years old, she started to resist Chavez's demands for sex. Doe's resistance upset Chavez. He altered the lock on Doe's bedroom door so that she could not lock it from inside the room. In addition, according to text messages from August 2017, Chavez blamed Doe for the situation and insisted that she give him "the days" for things to remain agreeable in the family.

In December 2017, Doe began working at a restaurant located in a local supermarket. Chavez visited the store and picked Doe up from work a few times. When Doe refused him sex, Chavez threatened to go to the supermarket and embarrass her there. He did so twice. He also threatened to get rid of Doe's cats if she refused sex. In addition, Chavez called Doe "a dog" and told her to "stop barking."

In text messages from March 2018, Chavez offered to get Doe a car (which she described as " 'awesome' ") if she gave him " 'three days' " in return. When Doe responded no, Chavez replied with stress-face and praying-hands emojis and asked " '[h]ow many then.' "

One day in April 2018, Chavez went to the supermarket where Doe worked, told one of Doe's friends to stop talking to her, and threatened to call the police. When Doe found out about what Chavez had done, she became very angry and embarrassed. She felt trapped by Chavez's controlling behavior. That night, Chavez refused to let Doe into

5

their apartment when she returned home late.  He told her to "jump through the window like a dog."

The next day, Chavez talked to Doe about having more sex and threatened to leave the family if she did not comply with his demands.  Doe told Chavez that she had " 'had enough.' "  Doe called E.D. and said that she (Doe) had something to tell E.D. but made E.D. promise not to inform the police.  Doe then told her mother that Chavez was a "very bad guy" and answered yes when her mother asked if Chavez had abused her.  E.D. said she would call the police.  When E.D. confronted Chavez about what he had done to Doe, Chavez said that he did " '[n]othing.  She's lying.' "

After the police arrived at the apartment, Doe refused to tell the police everything that had happened with Chavez.  She feared what might occur and did not want her siblings to lose their father.  Soon thereafter, a family friend (who was like an aunt to Doe) spoke with her.  Doe told the family friend about the abuse.  A police detective contacted Doe, and she told him what had happened to her.  Doe also spoke later to a different investigator about what had occurred.  Doe testified that she changed her mind about speaking to the police because she wanted justice and did not want Chavez to abuse her brothers.

In late April 2018, Doe went to a medical facility for a sexual abuse forensic examination.  Physician's assistant Marylou Ritter testified as an expert on forensic/medical sexual assault examinations and described her examination of Doe.  According to Ritter, during the examination, Doe said that Chavez had first touched her six years earlier with his hand and "private."  It hurt and, afterward, Doe sometimes had pain with urination.  Doe also reported suffering other acts of penial and digital penetration accompanied by pain.  Doe said that the last sexual act perpetrated by Chavez against her occurred a few months before the examination.

Ritter testified that she observed "normal looking hymen tissue" and explained that such a finding does not mean Doe had never experienced vaginal intercourse.  Ritter

6

opined that it would not be unusual for a victim who reported dozens of instances of vaginal penetrative sex ending two to three months before the examination to have no evidence of trauma. Ritter explained further that in her experience, it is common for a woman to have engaged in sex but to still have a normal looking hymen. Ritter cited a study in which 36 adolescent girls who were pregnant were examined and "34 of them had normal exams, no sign of penetrating trauma" despite the obvious evidence that they had been penetrated.

The police and Doe were unsuccessful in their attempts to conduct a pretext call with Chavez. Nevertheless, Doe, on her own, continued trying to record phone calls with Chavez to get proof of what he had done. In the first call that Doe recorded in July 2018, Chavez said that he would be incarcerated if Doe told the truth. He also said he did not want Doe to say anything to the police, wanted E.D. to drop the charges, and would help pay their rent.

During two calls recorded on a day in November 2018, Chavez stated that it was "good" Doe had not said anything and thanked her. He also said that if she talks, "they're going to fuck [him] up really bad" and "give [him] ten years" or "even more." After Doe described her nightmares about Chavez's demands for sex, Chavez asked Doe for forgiveness for all he had done to her but said it was not his fault. He also asked for her forgiveness for hitting her. When Doe mentioned that Chavez had demanded sex in exchange for his permission to do things, he said he was sorry and that they could not talk about it on the telephone. Chavez repeatedly expressed concern that someone might be listening to their conversation.

E.D. testified to corroborate the accidental phone call that Doe had described to the jury. E.D. said that during the phone call, she heard Doe crying and saying "that it burned, and that it hurt." E.D. also corroborated Doe's testimony about having once told E.D. about Chavez's abuse and then saying that it was not true. In addition, E.D. testified about times (beginning around 2016) that Chavez had forced her to have sex with him.

7

E.D. did not call the police on Chavez because she was afraid that he would become violent with her or her children. E.D. also recounted that Chavez had said to her that if she gave him sex, he would pay the rent and she would have "nothing to worry about."

Clinical psychologist Dr. Blake Carmichael testified as an expert on CSAAS. We describe his testimony further below (see pt. II.A.1.b.).

### 2. Defense Evidence

Chavez called four witnesses to testify about his good character, including a former girlfriend with whom he had a son, a sister, a former coworker/housemate, and a niece. The witnesses never saw Chavez act in a sexually inappropriate manner. The witnesses also described Chavez as strict in setting rules for children and other members of his household.

Chavez's sister testified that Doe "got along well with [Chavez]." The sister also said that everything always "looked good" between Chavez, E.D., and her children.

Chavez's niece described a time when she was a teenager that Chavez became "really upset" upon finding her with an older boyfriend. Chavez told the boyfriend that "he did not want him anywhere near" his niece. Chavez also became stricter with his niece after this incident.

## II. DISCUSSION

Chavez raises four claims on appeal. He contends: (1) portions of Dr. Carmichael's testimony should not have been admitted because that testimony "improperly profiled" him and Doe, the prosecutor committed misconduct by eliciting and relying on that testimony, and defense counsel provided constitutionally ineffective assistance by failing to object to the inadmissible evidence and the prosecutor's improper argument; (2) the trial court erred by instructing the jury with CALCRIM No. 1193 (CALCRIM 1193); (3) the alleged errors were cumulatively prejudicial; and (4) the matter should be remanded for a new sentencing hearing due to postsentencing changes to section 1170 made by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567).

8

We address Chavez's claims in turn. We group his first two claims, which both relate to the CSAAS evidence.

A. *Claims Regarding CSAAS Evidence and CALCRIM 1193*

    1. Background

        a. In Limine Motions and Rulings

The prosecutor moved in limine to admit expert testimony about CSAAS. The prosecutor asserted that CSAAS testimony "is commonly used to disprove common myths and misconceptions about children's reactions to sexual abuse" and "will assist the trier of fact in assessing the credibility of the complaining witness." The prosecutor asserted further that "the credibility of the child does not have to be attacked prior to admitting of this evidence so long as paradoxical behavior is at issue." The prosecutor noted that the testimony "will not be offered to prove that a sexual assault occurred, and the admonition provided in the jury instructions . . . will prevent the jury from considering the testimony for any impermissible purpose."

Chavez's defense counsel, likewise, filed an in limine motion "to exclude and limit certain evidence" concerning CSAAS. Relying on *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*), defense counsel argued that CSAAS testimony "is inadmissible to prove a molestation occurred" (boldface omitted) and stated that "impropriety" is "present where the expert gives 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused." Counsel further asserted that CSAAS testimony is irrelevant "[u]nless there is a danger a particular 'myth' or 'misconception' is being used by the defendant to attack the credibility of the victim." In the same vein, counsel argued: "Unless the witness'[s] delay in reporting is characterized by the defense as inconsistent with molestation, CSAAS testimony is not only irrelevant but highly prejudicial."

9

Additionally, counsel asserted "[t]he prejudice of such evidence clearly outweighs any limited probative value it may have. There may very well be no circumstances present which fit within the ambit of cases permitting limited introduction of CSAAS."

At a pretrial hearing on the in limine motions, the trial court noted that "much of what is said in the [d]efense papers is accurate," but the prosecutor was seeking to introduce the CSAAS evidence "merely to disprove certain myths and misconceptions." The court ruled that the prosecution's CSAAS expert would be allowed "to talk about the myths or misconceptions related to whether and why a victim might minimize related to potential nondisclosure or delayed reporting related to inconsistent reporting and related to continuing on in a relationship with someone known to be molesting them." The court explained that such testimony is relevant and permissible. In addition, the court offered to provide "a cautionary instruction to the jury on what they can use that evidence for" "prior to the testimony related to CSAAS." Defense counsel accepted the court's offer, and court said, "Okay. Then I will do that."[3]

Later in the pretrial hearing, the trial court decided defense counsel's further request "that each objection posed during these motions in limine constitute a continuing objection to the admission of such evidence during trial," citing *People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3 (*Jennings*).[4] The court granted the defense request but

_____

[3] Despite defense counsel's acceptance of the court's offer, no cautionary jury instruction was provided prior to Dr. Carmichael's testimony regarding CSAAS. Chavez makes no argument on appeal that the trial court erred in failing to provide the promised instruction before Dr. Carmichael testified.

[4] In *Jennings*, our Supreme Court said the following about the preservation of issues raised in limine: "Generally when an in limine ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal. [Citations.] The reason for this rule is that until the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility. When the parties stipulate on the record . . . that a ruling on an in limine

10

qualified its ruling: "My only caveat to granting this [request] is should new and different information come up during witness testimony or examination, then you should ask to approach the bench if you think it would affect my prior ruling."

### b. Dr. Carmichael's Trial Testimony

At trial, Dr. Carmichael testified as an expert on CSAAS. Dr. Carmichael did not review any police reports about this case or know any case facts.

Dr. Carmichael explained that CSAAS derived from an article written by Dr. Roland Summit in the early 1980s and was intended to educate people about some myths and misconceptions regarding victims of child sexual abuse. Dr. Carmichael noted the five components of CSAAS: Secrecy; helplessness; entrapment or accommodation; delayed, unconvincing, or conflicted disclosure; and recantation or retraction. He explained that these components are not a "behavioral check list" and "CSAAS itself does not determine if a kid was abused or not." Dr. Carmichael also explained that Dr. Summit wrote a second article in the 1990s, in response to the use of his original article "to decide if a kid was abused or not." In the second article, Dr. Summit said CSAAS was not for "determining if abuse occurred but helping people understand when abuse has occurred, [and] why we may see certain things we don't expect."

Dr. Carmichael explained that secrecy usually arises within the context of a trusted relationship in which the abuser convinces or coerces the child to remain silent with threats of negative consequences that would result from disclosure, including threats to leave the family or about "the fall-out for the family." Dr. Carmichael said children learn to obey authority figures and "that kind of dynamic can be enough for a child to not want

motion to exclude evidence will be binding, that stipulation should be deemed a continuing objection to admission. Failure to renew the objection when the evidence is offered does not waive the right to assert error on appeal in these circumstances." (*Jennings*, *supra*, 46 Cal.3d at pp. 975–976, fn. 3.)

to or feel comfortable going against that person in their life in other ways, including [with regard to] sexual abuse or telling about what's happened."

Regarding helplessness, Dr. Carmichael testified that "kids do not regularly bite, kick, scream, or somehow draw attention to the fact that abuse is occurring." He explained that the power dynamic favors the abuser, especially if the child is being abused by someone who is in a position of trust/authority or the child is concerned about negative consequences of disclosure, such as familial upset or financial distress due to dependence on the abuser. If the child's parent or caregiver is also being abused by the abuser, that "[c]ertainly" can play into the helplessness component by providing "cues to the child that if I tell, it could get worse." In addition, ongoing access or even an expectation of access by an abuser can make a child more hesitant to talk about abuse.

Dr. Carmichael explained that entrapment and accommodation refer to ways in which a child attempts to cope with abuse. The coping can include ineffectual actions to stop the abuse or cognitive "disassociation" to protect the child mentally and emotionally from feelings of embarrassment or shame. According to Dr. Carmichael, it is not uncommon for victims to submit to the abuser without resisting, to continue interacting with the abuser, to accept things of value from the abuser, or to get into a "quid pro quo"/"bartering situation" with the abuser.

Dr. Carmichael opined that an abuser might engage in "grooming behavior." That is, beginning a relationship with a child by "establishing ongoing contact and over time integrating sexual touch into the relationship, which may or may not appear inappropriate in initial stages." Dr. Carmichael added that reinforcers, such as rewards, might be used to encourage the child to tolerate the abuse.

Regarding delayed, unconvincing, or conflicted disclosure, Dr. Carmichael testified that "[m]ost kids don't tell right away. The research is showing that kids often take months or years to talk about the abuse that has occurred even after turning 18." In addition, the disclosure might not be "a one-time or get-it-all-out kind of event." Fear of

12

the abuser can affect the timing of disclosure. Further, it is not uncommon for victims to feel embarrassed about discussing their private parts or sexual acts with strangers. Disclosure of abuse is more common as a child ages, grows more independent, and has a larger social network "with more opportunities to tell or feel supported." With age, the child victim may develop physical or other abilities to resist the abuse. The abuser might react to the resistance by trying to be more convincing or forceful or by talking about the importance or special nature of the relationship. Dr. Carmichael said it was "[n]ot at all uncommon" for a victim to forget the specific details of each instance of abuse because of "the way memory works." Additionally, Dr. Carmichael explained that "the child victim may not show outward displays of emotion" when disclosing sexual abuse and might not "talk about everything that happened." Embarrassment and feelings of guilt "[a]bsolutely" can affect the disclosure.

On cross-examination, Dr. Carmichael explained that he did not "have an opinion as to whether or not someone was abused or was not abused" and "there's no diagnosis of CSAAS or sexual abuse." He reiterated that "CSAAS helps explain why kids do or don't do certain things." Dr. Carmichael acknowledged that secrecy, delayed disclosure, and helplessness in warding off an abuser could occur in the context of physical abuse, but he noted some differences between physical abuse and sexual abuse and restated the proper understanding of CSAAS. He explained that he was "not talking about if someone recants or retracts, therefore, they were abused. It's just not done that way." In addition, Dr. Carmichael said he was familiar with literature regarding fabricated allegations of sexual abuse. He explained that the "studies were finding that most of those allegations were made during custody disputes, or child access disputes, and those claims were made by adults and not the children."

Chavez's defense counsel did not object at any point during Dr. Carmichael's testimony.

13

c. Jury Instruction

After the close of evidence, the trial court instructed the jury on Dr. Carmichael's testimony with CALCRIM 1193 as follows: "You have heard testimony from Dr. Blake Carmichael regarding child sexual abuse accommodation syndrome. [¶] Dr. Carmichael's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged. [¶] You may consider this evidence only in deciding whether or not [Doe]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

There is no indication in the record that Chavez's defense counsel objected to the CALCRIM 1193 instruction.

d. Closing Arguments

The prosecutor mentioned Dr. Carmichael's testimony approximately four times during closing argument. The prosecutor said that Dr. Carmichael testified about CSAAS "and how these manipulation techniques are very commonly used by abusers and unfortunately very effective on kids." After noting that a 12-year-old girl is "a kid," the prosecutor continued: "Very effective on kids to get them to accommodate, to submit to sexual abuse, to feel helpless, to keep it a secret, and to not disclose, and that's what happened."

In his next mention of Dr. Carmichael's testimony, the prosecutor said: "And Dr. Carmichael also told you that this combination of threats with bribes and bargaining is a common and effective strategy used by abusers to continue to sexually abuse children in adolescence."

Later in his closing argument, when discussing certain threats Chavez had made to Doe, the prosecutor said: "And this corresponds exactly with what Dr. Carmichael told you about [CSAAS], about the techniques that the abuser will use and . . . unfortunately

14

how effective these techniques are for getting submission and maintaining secrecy because secrecy is key."

The prosecutor's final mention of Dr. Carmichael's testimony occurred during a discussion of the forcible rape counts (counts 6–10). After noting the ongoing "punishment, the withholding," and "the oddness of this bargaining system," and stating that Doe was "scared" of Chavez, the prosecutor added: "And Dr. Carmichael told you that this is very common. This is the accommodation of [CSAAS]. This is the accommodation, and he's being violent towards her brother and towards her. So this is adding to the implied threat of force and violence which is increasing the duress on her to submit, even when she's 17, although she's resisting more as you can see in the texts and in the phone calls."

The prosecutor concluded his closing argument by urging the jurors to find Chavez guilty because Doe "credibly told you what happened to her, and her testimony was corroborated and proven true with [Chavez]'s own words."

Chavez's defense counsel addressed Dr. Carmichael's testimony in his closing argument. Defense counsel conceded that Dr. Carmichael "did a good job of explaining conduct that is consistent with . . . survivors of childhood sexual abuse." Nevertheless, counsel urged the jurors to "remember [Dr. Carmichael is] not a percipient witness, and he specifically said he's not here to opine on the issue of whether [Doe] is a sexual abuse survivor." In addition, counsel argued that CSAAS could be "swap[ped] out" for "a similar kind of condition" called "childhood physical assault accommodation syndrome." Counsel asserted that the elements of CSAAS correlated to "people that are trying to hide physical abuse" and claimed that "the real value of Dr. Carmichael's testimony is that he supports this reasonable interpretation of these facts."[5]

_____

[5] Defense counsel contended in his closing argument, overall, that the evidence failed to prove Chavez's guilt beyond a reasonable doubt. To support this contention,

15

In his rebuttal argument, the prosecutor described Chavez's defense as: "[Doe] lied to you. She's a liar." The prosecutor mentioned Dr. Carmichael once in the rebuttal, when discussing the statements Doe had made to the physician's assistant Ritter about Chavez's sexual abuse. The prosecutor described Doe's report to Ritter as "a very limited disclosure just like Dr. Carmichael talked about."

### 2. Challenge to Dr. Carmichael's Testimony and the Prosecutor's Conduct

Chavez argues that "Dr. Carmichael's testimony about the common conduct of victims and abusers was inadmissible" and "improperly profiled" him and Doe, in contravention of *Bowker*, *supra*, 203 Cal.App.3d 385, *People v. Robbie* (2001) 92 Cal.App.4th 1075, and his constitutional right to a fair trial. Relatedly, Chavez asserts that in violation of due process protections and California law, the prosecutor committed misconduct by asking "Dr. Carmichael questions intended to elicit testimony about the typical conduct of victims and abusers" and by using Dr. Carmichael's "testimony [in closing argument] to argue that [Chavez] had acted like the typical abuser." In addition, Chavez contends that to the extent his defense counsel failed to preserve these alleged claims of error for appellate review, defense counsel rendered constitutionally ineffective assistance because his performance was deficient and prejudicial. Regarding the determination of prejudice, Chavez asserts the proper standard is that set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 and, in any event, the errors here were prejudicial whether analyzed under *Chapman*, *People v. Watson* (1956) 46 Cal.2d 818, 836, or *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).

---

counsel argued, inter alia, that the jurors could reasonably conclude Doe's allegations of rape were untrue based on the lack of forensic evidence supporting rape, the physical abuse perpetrated by Chavez, the "completely overboard" "dynamic of power and control" exerted by Chavez, and the "final straw" incident in April 2018 "that caused [Doe] to fabricate the worst thing that she could think of to ensure that [Chavez] is not only out of her house but out of her life."

The Attorney General counters that Chavez's claims of evidentiary error and prosecutorial misconduct are forfeited. The Attorney General further asserts that Chavez has failed to demonstrate defense counsel's deficient performance as to Dr. Carmichael's testimony or the prosecutor's conduct and, regardless, any error was harmless under any standard of prejudice.

### a. Forfeiture

Turning to the threshold issue of forfeiture, Chavez contends that his evidentiary challenge to Dr. Carmichael's testimony was preserved for appellate review by his in limine motion to exclude and limit the CSAAS evidence and his further request that an in limine objection constituted a continuing objection to the admission of evidence during trial. We disagree.

"A motion in limine can preserve an appellate claim, so long as the party objected to the specific evidence on the specific ground urged on appeal at a time when the court could determine the evidentiary question in the proper context." (*People v. Solomon* (2010) 49 Cal.4th 792, 821; see *People v. Whisenhunt* (2008) 44 Cal.4th 174, 210–211; see also *People v. Williams* (1988) 44 Cal.3d 883, 906; Evid. Code, § 353.)

As discussed *ante* (pt. II.A.1.a.), in his motion in limine, Chavez relied on *Bowker* to argue that CSAAS evidence is inadmissible to prove molestation occurred and it would be improper for an expert to give general testimony about the components of CSAAS "in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused." Although Chavez's in limine argument relates to his appellate claim that Dr. Carmichael's testimony improperly profiled him and Doe, his in limine argument did not provide any specifics that would fairly apprise the trial court (or the prosecutor) that the evidence he now challenges was improper.

Chavez's current claim of evidentiary error relies heavily on the context and particulars of Dr. Carmichael's testimony to assert that the testimony crossed the line from admissible CSAAS evidence to improper evidence that equated him and Doe with

17

"the typical abuser" and the "typical abuse victim." Given the generality of Chavez's in limine argument and the complexity of discerning whether certain testimony violated the general proposition that he iterated, we decide that Chavez's in limine motion failed to provide the trial court sufficient context for deciding the evidentiary question he currently raises on appeal.

Similarly, that the trial court granted Chavez's request for "a continuing objection" does not support his contention that his current claim was preserved for appeal. The trial court's ruling on Chavez's request for a continuing objection included the "caveat" that he should object during witness testimony if "new and different information" arose. As noted, Chavez's current evidentiary complaints are context specific and, as such, are based on information that is "new and different" from that asserted in his generic in limine motion. For these reasons, we decide that Chavez forfeited his appellate claim of evidentiary error by failing to object during Dr. Carmichael's testimony.

In addition, we are not persuaded by Chavez's argument that we should exercise our discretion to review his prosecutorial misconduct claim despite his failure to object on that ground during Dr. Carmichael's testimony and the prosecutor's closing argument.

"It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328; accord *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.) An objection allows " 'the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' " (*Seumanu*, at p. 1328.) The failure to object is excused if an objection would have been futile or if an admonition would not have cured the harm. (*Ibid.*)

Although a prosecutor may not "urg[e] use of evidence for a purpose other than the limited purpose for which it was admitted," (*People v. Lang* (1989) 49 Cal.3d 991, 1022, abrogated on another ground by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; see

18

also *People v. Crew* (2003) 31 Cal.4th 822, 839), "[p]rosecutors have wide latitude to discuss and draw inferences from the evidence at trial." (*People v. Lucas* (1995) 12 Cal.4th 415, 473.) Given the context-specific nature of Chavez's appellate challenge and the intricacies attendant to the prosecutor's presentation of and argument on CSAAS evidence, we conclude that forfeiture is appropriate here and thus decline to exercise our discretion to review the merits of Chavez's prosecutorial misconduct claim.

### b. Ineffective Assistance of Counsel

Having decided that Chavez's claims of evidentiary error and prosecutorial misconduct are forfeited by his failure to object at trial, we turn to his alternate claim of ineffective assistance of counsel (IAC). Chavez asserts that "the profile evidence – which painted [him] as an abuser and [Doe] as a typical victim – was highly damaging" and "[a]ny reasonably competent attorney would therefore have objected to the evidence and to the prosecutor's related misconduct." Chavez further asserts that his defense counsel had no tactical reason for failing to object at trial given that he had objected to "CSAAS profile evidence" in his in limine motion. Additionally, Chavez contends that his defense counsel's deficient performance was prejudicial, seeming to argue that the *Chapman* standard applies and, regardless, that he has shown prejudice under *Strickland* and *Watson*.[6]

The Attorney General counters that Chavez has failed to demonstrate deficient performance because "he cannot show that the evidence and argument was improper, and he cannot show that counsel did not have a reasonable tactical reason for declining to object." The Attorney General argues further that "the question of prejudice is not close" and "[a]ny possible error with regard to admission of evidence, or prosecutorial overreach was similarly harmless on any standard."

---

[6] The "*Watson* standard is substantially the same as the prejudice prong of *Strickland*." (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4.)

"[An] attorney's failure to object . . . to seriously damaging, inadmissible evidence which played a major role in the verdict of guilt" may signify constitutionally ineffective assistance. (*People v. Sundlee* (1977) 70 Cal.App.3d 477, 485.) Moreover, " '[a] defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).) However, a "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772.)

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; see also *Strickland*, *supra*, 466 U.S. at p. 687.)

"It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008 (*Mesa*).) In other words, prejudice requires a showing of "a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

Moreover, "the *Strickland* 'reasonable probability' standard applies to the evaluation of a Sixth Amendment claim of ineffective assistance of counsel, even when defense counsel's alleged error involves the failure to preserve the defendant's federal constitutional rights." (*Mesa*, *supra*, 144 Cal.App.4th at pp. 1008–1009; see also *Centeno*, *supra*, 60 Cal.4th at p. 676 [applying the *Strickland* prejudice standard to a

20

forfeited claim challenging a prosecutor's misstatements of law]; *Weaver v. Massachusetts* (2017) 582 U.S. 286, 300.)

We can reject an IAC claim if the defendant fails to establish either element of the *Strickland* standard. (See *Strickland*, *supra*, 466 U.S. at p. 687; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In this case, even if we assume deficient performance for the sake of argument, we are not persuaded that Chavez was prejudiced by defense counsel's failure to object to Dr. Carmichael's testimony and the prosecutor's argument. In accord with state and federal precedent, we decide that Chavez bears the burden to demonstrate prejudice under the *Strickland* standard, i.e., a reasonable probability that the outcome of his trial would have been different, but for his counsel's failings. (See *Mesa*, *supra*, 144 Cal.App.4th at pp. 1008–1009.)

Doe's credibility surely was a central and disputed issue at trial, especially because there was no forensic/medical evidence of physical trauma indicating that Doe had been sexually assaulted. Furthermore, if Dr. Carmichael had been precluded from giving testimony that coincided with the facts of the case, the force of his testimony would have been diminished and the prosecutor would not have been able to invoke Dr. Carmichael's testimony in the way that he did during his closing argument. Nevertheless, the prosecution presented other evidence that bolstered Doe's credibility and proved Chavez's guilt such that, regardless of the challenged testimony and argument, there is no reasonable probability of a different result in this case.

E.D. corroborated Doe's testimony about the accidental phone call that occurred during one of Chavez's sexual assaults. E.D. also corroborated Doe's report and recantation of Chavez's sexual abuse around age 14. Additionally, the prosecution presented text messages from August 2017 and March 2018 that showed Chavez negotiating for "days" in a manner that supported Doe's testimony that days meant sex.

Recorded telephone calls from Chavez later in 2018 provided further confirmation that the discussion of days referred to sex. The recorded calls also included statements and adoptive admissions that supported a finding of Chavez's guilt of the charged crimes.

We are not persuaded by Chavez's argument that his text messages and the references to " 'días' "/" 'days' " "could plausibly be explained as his attempts to persuade [Doe] to do chores around the house, especially since [Chavez] emphasized in the same texts that he would never 'bother' [Doe]." The August 2017 text messages do not include any explicit mention of chores and reveal a context that belies Chavez's argument. For example, Chavez texted that he was going to be " 'very sad' " to leave the family, would not return, and would blame Doe for " 'everything that happens.' " In response, Doe pointed out that Chavez was trying to make her feel bad, said they could " 'be well and all but as friends,' " and asked Chavez what else he wanted. Chavez replied, " '[a]nd *the days* [] what [*sic*] and I won't bother you again in the house. *I want it*.' " (Italics added.) He also swore that he would " 'change,' " " 'not open [Doe's] door,' " and " 'not touch' " Doe. Later, when Doe reiterated that they were friends, Chavez said, yes " 'but *you're going to give me the days*; ok.' " (Italics added.)

Similarly, in the March 2018 text messages, Chavez asked Doe (whom he called " 'my princess' ") if she wanted him to get a car for her. When Doe said she liked the car, Chavez responded, " '*Let's leave it at three days*; *ok*? And I won't tell you anything, yes.' " (Italics added.) When Doe responded no, Chavez replied with stress-face and praying-hands emojis and asked " 'How many then.' " We reject as implausible Chavez's contentions that this message did not involve an effort to trade a car for sex and that Chavez would get Doe a car in exchange for three days of housework.

Furthermore, the recorded telephone calls undermine Chavez's assertion that the text messages concerned household chores. In the calls, Chavez expressed concern about talking on the phone when Doe said that she had to give him "days or sex" and further said he was sorry for "all of that" after Doe talked about Chavez having wanted her to

22

" 'give [him] sex' " " 'to allow her to use her cellular or something.' "  Chavez did not deny Doe's suggestions that their interactions included sex.  Rather, he said that he would receive several years imprisonment for "sexual abuse" and would be incarcerated if Doe told "the truth."  Under these circumstances, we reject Chavez's assertion that the text messages demonstrate his attempts to persuade Doe "to do chores around the house."

Likewise, we are not convinced by Chavez's argument that his "physical and emotional abuse" of Doe, B.D., and E.D. gave them "a strong motivation to accuse [him] of conduct that would get him out of their lives forever."  If Doe had disclosed only Chavez's physical and emotional abuse, that disclosure would have produced a possibility that Chavez would be held accountable for his misbehavior while sparing Doe the intense scrutiny that accompanied her report of sexual abuse.  In addition, the prosecution presented evidence that Doe was reluctant to report Chavez to law enforcement even after she told her mother about the sexual abuse in April 2018.  Under these circumstances, it is not reasonably probable that a juror would have found that Doe told an intricate yet false story of Chavez's long-term sexual abuse (which E.D. and B.D. corroborated) to ensure that Chavez would be excised from the family and stop him from perpetrating physical and emotional abuse.

For these reasons we conclude that assuming defense counsel performed deficiently, and the trial court would have excluded the case-specific portions of Dr. Carmichael's testimony and the prosecutor's related arguments had counsel objected, Chavez has failed to demonstrate a reasonable probability that the outcome of his trial would have been different, but for his counsel's deficient performance.

### 3. Challenge to CALCRIM 1193

Chavez contends the trial court erred and prejudicially violated his due process and jury trial rights by instructing the jury with CALCRIM 1193.  Focusing on the final phrase in the instruction, which told the jurors they could consider the CSAAS evidence "in evaluating the believability of [Doe's] testimony," Chavez argues that the "phrase

23

fails to make clear that the expert testimony 'should not be used to determine whether the victim's molestation claim is true.' "

Chavez acknowledges that his defense counsel failed to object to the CALCRIM 1193 instruction. Notwithstanding the Attorney General's assertion of forfeiture, we reach the merits of Chavez's claim because he contends the challenged instruction was legally incorrect and affected his substantial rights.[7] (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *People v. Gomez* (2018) 6 Cal.5th 243, 312; § 1259.)

"We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) "We of course presume 'that jurors understand and follow the court's instructions.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

Chavez acknowledges that other California Courts of Appeal have upheld the language of CALCRIM 1193 as accurately informing the jury about the limited use of CSAAS evidence. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*); *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175–176 (*Lapenias*).) Nonetheless, Chavez contends that the reasoning of those cases is flawed.

We are not persuaded that the existing precedent is wrong. Moreover, assessing the instruction in light of the entire record, we are not convinced that there is a reasonable likelihood the jurors here applied the instruction in an impermissible manner. The instruction told the jurors that Dr. Carmichael's testimony could not be considered as evidence that Chavez "committed any of the crimes charged against him or any conduct

---

[7] Because we address the merits of Chavez's instructional error claim, we need not consider his alternative IAC claim concerning defense counsel's failure to object to CALCRIM 1193.

or crimes with which he was not charged." Thus, the instruction explicitly precluded the use of that testimony to conclude inferentially from Doe's conduct and Dr. Carmichael's testimony that Chavez committed the charged or uncharged crimes. Moreover, the last sentence of the instruction did not compel a conclusion that Doe's conduct was consistent with being a sexual abuse victim. In addition, Dr. Carmichael testified that CSAAS is not a "behavioral check list" and does not determine whether a child "was abused or not." He also explained that he had no opinion about "whether or not someone was abused or was not abused."

Under these circumstances, we conclude that the trial court properly instructed the jury with CALCRIM 1193, and Chavez's constitutional rights were not violated by that instruction. (See *Gonzales*, *supra*, 16 Cal.App.5th at p. 504; *Lapenias*, *supra*, 67 Cal.App.5th at p. 175.)

B. *Cumulative Error*

Having concluded that Chavez's IAC claim fails due to a lack of prejudice and his challenge to CALCRIM 1193 has no merit, we in turn reject his claim of cumulative prejudice resulting from the asserted errors. There is no prejudicial error to cumulate. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

C. *Imposition of Upper Terms and Senate Bill 567*

Chavez contends he is entitled to the benefit of ameliorative changes made postsentencing to section 1170, subdivision (b) (hereafter section 1170(b)), which altered the requirements for imposition of an upper term. (See Stats. 2021, ch. 731 [eff. Jan. 1, 2022].[8]) Chavez further argues that this matter should be remanded for resentencing under current law. The Attorney General agrees that amended section 1170(b) applies to this case but asserts that a remand is not necessary under the present circumstances.

---

[8] The Legislature has amended section 1170 since enacting Senate Bill 567, but the more recent changes to section 1170 do not affect our analysis of Chavez's claim. (See Stats. 2022, ch. 744, § 1 [Assembly Bill No. 960; eff. Jan. 1, 2023].)

1. <u>Background</u>

The probation officer's report prepared for Chavez's sentencing recommended consecutive upper terms for counts 6 through 10, noting four factors in aggravation (see Cal. Rules of Court, rule 4.421(a)(1), (8), (11) & (b)(1)[9]).

At Chavez's sentencing hearing in November 2021, the trial court explained that it had to consider "whether the case is aggravated or mitigated." The court noted that Doe had testified about "numerous different sexual assault acts," including more than 20 rapes during a two- to three-year period, the first of which occurred "while her mother was in the hospital recovering from [childbirth]." The court explained that Chavez "clearly was in a position of trust with this young woman . . . who really looked at Mr. Chavez as a father figure." The court stated further that Doe suffered "both emotional and physical trauma" and Chavez's conduct (including his controlling behavior) showed "a high degree of cruelty."

In addition, the trial court stated that Chavez's crimes involved "planning and sophistication" "in terms of getting [Doe] in a position where he could perform these acts. There w[ere] numerous acts over a substantial period of time where [Chavez] could have chosen to stop committing these acts. There were discussions, as the victim got older, with [Chavez], and yet he continued to exercise control over her and commit the behaviors."

The trial court summed up its discussion of the aggravation by specifying the application of the following "significant factors in aggravation" under rule 4.421: Factor (a)(1) applies because "[t]here was . . . great violence . . . in terms of how the acts were committed against [Doe]"; factor (a)(8) applies because the crime "did show planning to get [Doe into] circumstances where those acts would occur"; factor (a)(11) applies because Chavez "certainly did take advantage of a position of trust, especially based on

---

[9] Rule references are to the California Rules of Court.

their relationship"; and factor (b)(1) applies because Chavez "engaged in [] violent conduct, specifically the rapes along with the others."

The trial court found only one circumstance in mitigation, namely Chavez's insignificant record of criminal conduct (see rule 4.423(b)(1)).[10]

As to counts 6 through 10 (forcible rape of a minor (§§ 261, subd. (a)(2), 264, subd. (c)(2))), the trial court imposed five, consecutive upper terms of 11 years.

### 2. Legal Principles

At the time of Chavez's sentencing in November 2021, section 1170 provided, "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . . The court shall select the term which, in the court's discretion, best serves the interests of justice." (§ 1170, former subd. (b).)

Effective January 1, 2022, section 1170, subdivision (b) was amended "to limit the sentencing discretion of trial courts. (Stats. 2021. ch. 731, § 1.3.)" (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1108 (*Zabelle*); see *People v. Garcia* (2022) 76 Cal.App.5th 887, 902 (*Garcia*).) Current section 1170, subdivision (b)(1) directs a trial court to impose not more than the middle term of a sentencing triad "except as otherwise provided in paragraph (2)." Paragraph (2) provides: "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (*Id.*, subd. (b)(2).) The trial court may also consider "the defendant's prior convictions in

---

[10] According to the probation officer's report, Chavez had six prior misdemeanor convictions, i.e., two for driving under the influence of alcohol, and four for driving while his privileges were suspended or revoked.

determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (*Id.*, subd. (b)(3).)[11]

Section 1170, subdivision (b)(4) provides: "The court may consider the record in the case, the probation officer's report, other reports, including reports received pursuant to [s]ection 1203.03, and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing." However, section 1170, subdivision (b)(4) does not permit the court to impose an upper term without compliance with section 1170, subdivision (b)(2) and (3). Under section 1170, subdivision (b)(5), the trial court must "set forth on the record the facts and reasons for choosing the sentence imposed. The court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law."

3. Analysis

The Attorney General concedes that the amendments to section 1170 apply retroactively to Chavez. We agree. (See *Garcia*, *supra*, 76 Cal.App.5th at p. 902.)

The parties dispute the issue of prejudice. Chavez argues that the record does not support the four aggravating factors relied on by the trial court beyond a reasonable doubt. He further asserts that there is no clear indication in the record that the trial court would have imposed five upper terms for counts 6 through 10 had it been aware of the current statutory presumption in favor of the middle term. The Attorney General counters that resentencing is not warranted because "[t]he record supported each of [the aggravating] factors [cited by the trial court] beyond a reasonable doubt" and "there is no possibility that the trial court would change its sentence if given the opportunity."

The California Courts of Appeal are currently divided on the standard to be applied in determining whether there is harmless error when the defendant is sentenced

---

[11] Because the trial court did not consider Chavez's prior convictions as aggravation, section 1170, subdivision (b)(3) does not apply.

under the former version of section 1170 and where the amended version applies retroactively to the defendant. (See, e.g., *People v. Flores* (2022) 75 Cal.App.5th 495, 500–501 [error is harmless if the reviewing court determines, beyond a reasonable doubt, that the jury would have found, beyond a reasonable doubt, at least one aggravating circumstance true]; *People v. Lopez* (2022) 78 Cal.App.5th 459, 467, fn. 11 [error is harmless if the "reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied"; if not, the reviewing court must then determine whether it is reasonably probable the "trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied"]; *People v. Wandrey* (2022) 80 Cal.App.5th 962, 982 [reviewing court "must ask both whether we can be certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court and whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term"]; *Zabelle*, *supra*, 80 Cal.App.5th at p. 1112 [reviewing court must first determine beyond a reasonable doubt that "jury would have found true at least one of the aggravating circumstances that the trial court relied on," and then second, determine whether, if the trial court relied on other aggravating circumstances, "it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error," which requires determining "for each aggravating fact, [] whether it is reasonably probable that the jury would have found the fact not true" and "then, with the aggravating facts that survive this review, [] whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts"]; *People v. Dunn* (2022) 81 Cal.App.5th 394, 409–410, fn. omitted, review granted Oct. 12, 2022, S275655 ["reviewing court determines (1)(a) beyond a reasonable doubt

29

whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt"]; *id*. at p. 410 [if not, reviewing court must then determine "(2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)"]; *People v. Lewis* (2023) 88 Cal.App.5th 1125, 1131–1138, review granted May 17, 2023, S279147 [discussing the various approaches]; *People v. Falcon* (2023) 92 Cal.App.5th 911, 938, review granted Sept. 13, 2023, S281242 [concluding that "resentencing is unwarranted in retroactive cases only when the upper term remains legal under state and federal law at the first step; and, if so, pursuant to [*People v. Gutierrez* (2014) 58 Cal.4th 1354] at a mandatory second step, the record clearly indicates the trial court would impose the upper term had it known the middle term was the presumptive maximum sentence" (italics omitted)].)

The issue of which prejudice standard applies to a reviewing court's determination whether a case should be remanded for resentencing in light of Senate Bill 567 is pending before the California Supreme Court. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.)

In this case, we need not decide which of the potential standards for assessing prejudice is correct because, on this record, we are convinced beyond a reasonable doubt that all the aggravating factors relied on by the trial court to impose upper terms for the five forcible rape counts (occurring after June 22, 2014) would have been found true beyond a reasonable doubt by the jury.

Regarding whether the forcible rapes involved "great violence . . . or other acts disclosing a high degree of cruelty, viciousness, or callousness" (rule 4.421(a)(1)), Doe

testified that Chavez forced her to give him sex to use her cellphone, go out with friends, eat fast food, or buy clothes. She also testified that Chavez's demands for sex became "[m]ore frequent" as she grew older, and he raped her about one to three times per week. Based on this evidence, the jury would have found true beyond a reasonable doubt that the charged rapes involved at least a high degree of cruelty, viciousness, or callousness.

Regarding whether the forcible rapes involved "planning, sophistication, or professionalism" (rule 4.421(a)(8)), the evidence showed that Chavez "set up a schedule" for his desired sex and required more sex if Doe wanted to do something that had not yet been accounted for in Chavez's schedule. In addition, Doe testified about how Chavez created opportunities for sex with Doe including by sending E.D. out of the house to pick up the other children and keeping Doe at home. This evidence would have resulted in a true finding by the jury, beyond a reasonable doubt, that Chavez planned the charged rapes.

Similarly, the jury would have found beyond a reasonable doubt that Chavez "took advantage of a position of trust" (rule 4.421(a)(11)) to commit the forcible rapes. Chavez was a father figure and "the adult that was most in charge" in the household. He asserted his dominance, and E.D. deferred to him. This evidence supports that Chavez leveraged his status in the family to commit the charged crimes.

Regarding whether Chavez "engaged in violent conduct that indicates a serious danger to society" (rule 4.421(b)(1)), Doe testified that she often told Chavez that it hurt when he penetrated her and sometimes tried to push him off, to no avail. In addition, he sometimes held Doe's arms during sex to ensure that she could not get away. Based on this evidence of the manner in which Chavez perpetrated these crimes against a young girl, the jury would have found true beyond a reasonable doubt that Chavez engaged in violence indicating a serious danger to society.

In sum, we are convinced that under any prejudice standard the trial court's failure to apply amended section 1170(b) was harmless. Furthermore, at the sentencing hearing,

the trial court accepted the probation officer's recommendation for the maximum sentence and said it was "an appropriate sentence" based on the trial evidence and the impact on Doe. A remand is not necessary if "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion" under a subsequently amended statute. (*Gutierrez*, *supra*, 58 Cal.4th at p. 1391.) This is true because "remand is not appropriate when it would be an idle act." (*People v. Jefferson* (2019) 38 Cal.App.5th 399, 409.) That standard is satisfied here. We thus reject Chavez's request for a remand for resentencing under current section 1170(b).

## III. DISPOSITION

The judgment is affirmed.

_____
                       Danner, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P.J.

_____
Bromberg, J.

**H049752**
*People v. Chavez*